```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .    Case No. 1:11-MJ-00893
                             .    (AK)
            Plaintiff,       .
                             .    Washington, D.C.
     v.                      .    December 1, 2011
                             .
JEREMY FASSINA,              .
                             .
            Defendant.       .
. . . . . . . . . . . . . . .

              EXCERPT OF HEARING
      DIRECT EXAMINATION OF OFFICER FANONE
    BEFORE THE HONORABLE JOHN M. FACCIOLA
          UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     U.S. Attorney's Office
                       By:  PATRICIA STEWART, AUSA
                       555 Fourth Street, N.W.
                       Washington, DC 20530

For the Defendant:     Federal Public Defender
                       By:  JONATHAN JEFFRESS, ESQ.
                       625 Indiana Avenue, N.W.
                       Suite 550
                       Washington, DC 20004
```

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335 - (860) 464-1083

1          *   *   *
2     OFFICER MICHAEL FANONE, PLAINTIFF'S WITNESS, SWORN
3                     DIRECT EXAMINATION
4  BY MS. STEWART:
5  Q.   Sir, please state your name, and spell your last
6  name for the record?
7  A.   Michael Fanone.  My last name is spelled "F" as in
8  "Frank", A-N-O-N-E.
9  Q.   Are you employed with the Metropolitan Police
10 Department at this time?
11 A.   Yes, ma'am, I am.
12 Q.   And what is your current rank and duty assignment?
13 A.   I'm an officer, and I'm assigned to the First
14 District's Vice Unit.
15      I've been with MPD since 2003.
16 Q.   In the course of your duties in the -- as a vice
17 officer in the First District, are you familiar with
18 the controlled substance, methamphetamine?
19 A.   Yes, ma'am.
20 Q.   Have you participated in investigations involving
21 the seizure of methamphetamine?
22 A.   Yes, ma'am.
23 Q.   Do you know what the term "Crystal meth" is, with
24 respect to methamphetamine?
25 A.   Yes, ma'am.

1  Q.   Please describe for the Court, what "Crystal meth"
2  or "Crystal methamphetamine" is.
3  A.   "Crystal methamphetamine" is a term referring to
4  the appearance of that form of methamphetamine.  It
5  takes on a crystalized appearance.
6  Q.   Is there anything different between
7  methamphetamine in its crystalized form, and other
8  forms of methamphetamine, according to what you've
9  learned in your training and experience?
10 A.   The crystalized form, also called "Ice", is a pure
11 form of methamphetamine.
12 Q.   Now, Officer, did you obtain a search warrant on
13 October 15th of 2011, for the premises known as
14 Penthouse Number 20, at 130 M Street, Northwest in the
15 District of Columbia?
16 A.   Yes, ma'am.
17 Q.   And what did the warrant authorize you to search
18 for on those premises, generally?
19 A.   Illicit or illegal drugs, drug paraphernalia.
20 Q.   And how did you come by information that led you
21 to obtain the search warrant?
22 A.   I was contacted by patrol officers who had spoken
23 with Mr. Fassina's then boyfriend, Ray J. Minor
24 (phonetic).  Mr. Minor informed them and then me, that
25 his boyfriend, Jeremy Fassina, was a major distributor

1  of methamphetamine and crystal methamphetamine.
2  Q.   And just to be perfectly clear, the reason the
3  patrol officers came in contact with Mr. Minor was
4  because Mr. Minor was charged with assaulting the
5  Defendant; is that correct?
6  A.   That is correct.
7  Q.   Now, did you participate in the execution of the
8  search warrant on October 15th, 2011?
9  A.   Yes, ma'am, I did.
10 Q.   Was the Defendant present?
11 A.   No, ma'am.
12 Q.   Was anyone present on the premises when you wrote
13 -- participated in the search?
14 A.   No, ma'am.
15 Q.   Did you recover any drugs from the premises on
16 October the -- excuse me, on October 15th?
17 A.   Yes, ma'am.  From the residence we recovered
18 approximately 44 grams, with packaging, of a crystal --
19 white, crystal substance, a portion of which tested
20 positive for amphetamines.
21 Q.   And where on -- where in the premises did you find
22 the drugs?
23 A.   Approximately 9 grams was recovered from a den in
24 the apartment of Penthouse Number 20.
25      Another 35 grams was recovered from a locked safe,

1   which was located also in the den.
2   Q.   With respect to the drugs that were recovered from
3   the safe, were there any documents, or personal papers,
4   or identifications of any type in that safe?
5   A.   Yes, ma'am.  I reviewed those documents.  They
6   were personal documents belonging to Mr. Fassina.
7   Q.   Were there any documents, identification or other
8   materials that related to any individual other than Mr.
9   Fassina?
10  A.   No, ma'am.
11  Q.   Did you find within the house, within the
12  premises, the apartment, any documents or personal
13  papers relating to any individual other than Mr.
14  Fassina?
15  A.   We did find several documents depicting the name
16  of -- Mr. Minor's name, "Ray J. Minor."
17  Q.   Were -- But were any of those in the safe with the
18  drugs?
19  A.   No, ma'am.
20  Q.   Did you recover any items that, in your
21  experience, are related to or used in the preparation
22  or packaging and distribution of methamphetamine,
23  during this particular search?
24  A.   Yes.  We recovered a digital scale from the
25  residence, also a measuring spoon with a white, crystal

1  residue.
2  Q.   Did you recover any significant amount of
3  currency?
4  A.   Yes.  From another safe inside of the spare
5  bedroom in Penthouse Apartment Number 20, we recovered
6  $7,396 in U.S. currency.
7  Q.   Were there any documents or forms of
8  identification in the safe with the currency?
9  A.   Yes.  I believe Mr. Fassina's passport and several
10 government identification cards were also inside the
11 safe.
12 Q.   In the safe with the currency, were there any
13 other forms of identification (inaudible)?
14 A.   No, ma'am.
15 Q.   Did you learn who the lessor of the penthouse
16 apartment was?
17 A.   Yes, Mr. Jeremy Fassina.
18 Q.   And were you able to obtain a copy of the lease
19 for those premises?
20 A.   Yes.
21       MS. STEWART:  Your Honor, may I approach the
22 witness?
23       THE COURT:  Certainly.
24       MS. STEWART:  And for the record, I've
25 already shown what's being marked as Government's

```
 1    Exhibit Number 1 to Defense Counsel, and provided him
 2    with a copy prior to this hearing.
 3               THE COURT:  Thank you.
 4    BY MS. STEWART:
 5    Q.   Officer, do you recognize what's been marked for
 6    identification as Government's Exhibit Number 1 for
 7    this hearing?
 8    A.   I do.
 9    Q.   What is it?
10    A.   It is a lease contract for 130 M Street,
11    Northwest, Penthouse Apartment Number 20.  I'm sorry,
12    Northeast, Penthouse Apartment Number 20.
13               MS. STEWART:  Your Honor, the Government
14    would move the document (inaudible).
15               MR. JEFFRESS:  No objection for this hearing,
16    Your Honor.
17               THE COURT:  Be admitted.
18    BY MS. STEWART:
19    Q.   Officer, when was that document executed,
20    according to the document?
21    A.   The initial term of the lease began the 29th day
22    of January, 2011.
23    Q.   And does the lease indicate what the monthly rent
24    is?
25    A.   Yes.  Let me find it.
```

1           (Pause.)
2  Q.   Perhaps halfway down the page?
3  A.   I'm not seeing it.
4  Q.   Well, the document is admitted and will speak for
5  itself with respect to that.
6  A.   Oh, I'm sorry.
7  Q.   What is the rent?
8  A.   $3,790 per month.
9  Q.   Does that include utilities?
10 A.   No, ma'am, it does not.
11 Q.   Does it include parking?
12 A.   No, ma'am, it does not.
13 Q.   Let me now show you what's being marked for
14 identification as Government's Exhibit Number 2, and I
15 believe a copy has been provided to Defense Counsel
16 prior to this hearing.
17      Do you recognize that document?
18 A.   Yes, I do.
19 Q.   What is it?
20 A.   It's a Xerox copy of a pay stub belonging to Mr.
21 Fassina.
22 Q.   And was that (inaudible)?
23 A.   Yes, it was.
24 Q.   And what, according to that pay stub, was his
25 monthly income -- net income?

1  A.    Monthly net income --
2  Q.    For -- (Inaudible.)  Strike that.
3        His bi-weekly net income, as in (inaudible)?
4  A.    I believe it was $1700.
5  Q.    Did you learn, in your investigation, how Mr.
6  Fassina was employed in 2010?
7  A.    Mr. Fassina, according to our investigation, was
8  unemployed.  He was receiving a disability.
9  Q.    But prior to that, what was his -- where was he
10 employed?
11 A.    Oh, I'm sorry.  He was employed in the United
12 States Navy.
13 Q.    Do you know his rank; if you know?
14 A.    I believe it was an E-5.
15 Q.    Now, you've been inside the apartment of Penthouse
16 Number 20.
17       When you went in on October 15th, can you tell the
18 Court, generally, the appearance of the apartment?
19 Anything unusual you noticed, other than the contraband
20 you described?
21 A.    The interior of the apartment was decorated with a
22 lot of high-end electronic equipment, projection TV,
23 large flat-screen TVs.
24       I believe in each bedroom -- In each room of the
25 apartment there was a lot of high-end clothing and

1   other accessories.
2   Q.  Now, after October the 15th, 2011, did you have
3   any contact with Mr. Minor?
4   A.  Yes, I did.
5   Q.  And during the contact with Mr. Minor, was he
6   under arrest or not under arrest at that time?
7   A.  He was not under arrest.
8   Q.  Did you indicate to him whether or not he was
9   under investigation?
10  A.  No, I did not.
11  Q.  What did -- To your knowledge, did he have any
12  reason to know about the search warrant, and what was
13  seized --
14          MR. JEFFRESS:  I'm sorry, Your Honor, what --
15  Your Honor, I don't think they've established a date
16  for this.
17          THE COURT:  I'm sorry, sir?
18          MS. STEWART:  I'm sorry.
19          THE COURT:  Please do so.
20  BY MS. STEWART:
21  Q.  Prior to October 15th and -- I'm sorry, subsequent
22  to October 15th, 2011, and prior to Mr. Fassina's
23  arrest in this case, to your knowledge, was he made
24  aware that the police had searched his apartment?
25  A.  No.

```
 1  Q.   He was unaware that they had searched his
 2  apartment?
 3  A.   Oh, I apologize.  Yes, ma'am, he was.
 4            THE COURT:  The "he" in that sentence is who,
 5  Minor?
 6            THE WITNESS:  Yes.  I was confused, I'm
 7  sorry.
 8            MS. STEWART:  No, --
 9            THE COURT:  Minor?
10            MS. STEWART:  -- Mr. Fassina.  Mr. Fassina.
11            THE WITNESS:  Mr. Fassina.
12  BY MS. STEWART:
13  Q.   Was he or was he not aware that you had recovered
14  contraband from his apartment?
15  A.   Mr. Fassina was aware --
16            MS. STEWART:  Your Honor, --
17  A.   -- that we had recovered contraband.
18            MS. STEWART:  -- I misspoke.  I apologize.
19  BY MS. STEWART:
20  Q.   Now, let me direct your attention to November
21  19th, 2011.
22       On that date, did you obtain a search -- second
23  search warrant for the premises known as Penthouse 20
24  (inaudible)?
25  A.   Yes, I did.
```

1  Q. And what was that search warrant for?
2  A. Electronic storage devices.
3  Q. And did you execute the warrant on October
4  (inaudible), 2011?
5  A. The second?
6  Q. Yes, the second search warrant.
7  A. I believe it was --
8  Q. (Inaudible.)
9  A. -- November 18th, correct.
10 Q. You -- Did you participate in the execution of
11 that warrant?
12 A. Yes, ma'am.
13 Q. And would you tell the Court what, if anything,
14 you found during the execution of the second warrant?
15 A. Several electronic storage devices, namely one
16 desktop computer, three laptop computers, accessories
17 belonging to those computers, a cellular phone, and an
18 additional approximate 29 grams of a crystal -- white
19 crystal substance, a portion of which field tested
20 positive for amphetamine.
21         THE COURT: How much was it, sir?
22         THE WITNESS: Approximately 29 grams, Your
23 Honor, with packaging.
24 BY MS. STEWART:
25 Q. Was Mr. Fassina present when you executed the

1   second search warrant?
2   A.   No.
3   Q.   Was anybody present on the premises when you
4   executed the second search warrant?
5   A.   No, ma'am.
6   Q.   Did you find any personal belongings of any kind
7   (inaudible) Mr. Minor when you executed the second
8   search warrant?
9   A.   No, ma'am.
10  Q.   Where were those drugs found, during the second
11  search, Officer?
12  A.   They were inside of a jacket pocket, which was
13  located in a closet in the den.
14  Q.   And you testified earlier about crystalized
15  (inaudible) methamphetamine.
16       Based upon your experience in investigating
17  methamphetamine cases, and what you viewed in the
18  Defendant's apartment, did it or did it not appear to
19  you to be crystal methamphetamine?
20            MR. JEFFRESS:  Your Honor, I think I'm going
21  to object to this without some sort of testing of the
22  actual drugs.  I --
23            THE COURT:  Well, what do you understand
24  crystal methamphetamine looks like?
25            THE WITNESS:  It's a --

1  THE COURT: It's a dumb question. I imagine
2  it's a crystal.
3  THE WITNESS: Correct, Your Honor.
4  THE COURT: All right.
5  THE WITNESS: It can be a crystalized
6  substance with either a whitish tint or a yellowish
7  tint, depending upon the cooking process that's used to
8  manufacture.
9  THE COURT: All right.
10  Is the -- Is it smoked or injected?
11  THE WITNESS: It's smoked.
12  THE COURT: In a pipe or something?
13  THE WITNESS: Correct.
14  THE COURT: Yes.
15  BY MS. STEWART:
16  Q. From what you --
17  THE COURT: I take it -- Excuse me.
18  This object you found in the jacket pocket,
19  why did you think it was crystal methamphetamine?
20  THE WITNESS: Based on my experience,
21  training.
22  THE COURT: Well, what did it look like?
23  THE WITNESS: It was a white, crystal
24  substance.
25  THE COURT: Okay.

1    Is this a -- Is it in individual chunks or is
2 it a large, indivisible piece of a chemical substance?
3    THE WITNESS: No, there was several large
4 chunks. There was also, you know, some smaller crystal
5 forms.
6    THE COURT: And when people call it
7 "Crystal", does that mean you can see through it? Is
8 it transparent?
9    THE WITNESS: No, it is not transparent.
10    THE COURT: Thank you.
11 BY MS. STEWART:
12 Q.  Based upon what you know about crystal
13 methamphetamine, what would be the retail street value
14 of one gram in the District of Columbia (inaudible)?
15 A.  In the District of Columbia, one gram of crystal
16 methamphetamine can go for anywhere from $300 up to 6
17 or $700.
18 Q.  Now, you also obtained a search warrant on October
19 15th, 2011, for a storage locker in the apartment
20 complex; is that correct?
21 A.  That's correct.
22 Q.  And did you search that storage locker?
23 A.  Yes.
24    THE COURT: So this is the third warrant?
25    MS. WARRANT: No; apologize, Your Honor.

1   Again, that was -- I'll repeat the question.
2   BY MS. STEWART:
3   Q.   On October 15th, 2011, at the time you obtained
4   the initial search warrant for the apartment, did you
5   also obtain a search warrant for a storage locker in
6   the apartment building?
7   A.   That's correct.
8   Q.   And whose storage locker did you obtain the
9   warrant for?
10  A.   I obtained a warrant for Mr. Fassina's storage
11  locker.
12  Q.   Did you seize anything from that storage locker?
13  A.   No.
14  Q.   Did you observe anything of significance to your
15  investigation in the storage locker?
16  A.   On the night of the fifteenth, the storage locker
17  which we were taken to by the property management
18  company, which coincided with Penthouse Apartment 20,
19  was empty.  However, on our return for the subsequent
20  -- to speak with Mr. Fassina, he took us to the actual
21  storage locker which he used.
22       At that time he gave us consent to search the
23  storage locker, and we observed numerous U.S. Postal
24  prepaid packaging materials.
25  Q.   And why is that of significance to you in

1 investigating methamphetamine cases?
2 A. From what I've learned through my investigation,
3 also in speaking with members of the DEA, in this area
4 it's -- money and drugs are -- or, I'm sorry, money and
5 methamphetamine are known to be distributed through the
6 post office, through the mail.
7 Q. Have you yourself, during the course of
8 investigating methamphetamine distribution in the
9 District of Columbia, observed amounts of cash in
10 mailing envelopes?
11 A. Yes, ma'am.
12     MS. STEWART: Court's indulgence.
13   (Pause.)
14     MS. STEWART: Your Honor, at this time I have
15 no further questions for the Officer.
16     THE COURT: Officer, please help me, and back
17 up a bit.
18     Who is under arrest for assaulting whom? I'm
19 sorry, I didn't catch that.
20     THE WITNESS: I apologize, Your Honor.
21     THE COURT: No, don't apologize. I didn't
22 catch it.
23     THE WITNESS: Mr. Minor, Ray --
24     THE COURT: Minor?
25     THE WITNESS: Minor.

```
 1              THE COURT:  Yes.
 2              THE WITNESS:  Yes, is -- was arrested for
 3    assaulting Jeremy Fassina.
 4              THE COURT:  All right.
 5              So at the point you talked to Minor, is Minor
 6    in prison?
 7              THE WITNESS:  He was in custody.  He was
 8    actually at the hospital.
 9              THE COURT:  Where he -- He was there as a
10    result of being --
11              THE WITNESS:  Of --
12              THE COURT:  -- beaten?
13              THE WITNESS:  -- the assault between him and
14    Mr. Fassina.
15              THE COURT:  Okay.
16              But who gets locked up for that assault,
17    Fassina or Minor?
18              THE WITNESS:  It was ultimately determined
19    Mr. Minor was the aggressor, so he was arrested.
20              THE COURT:  (Inaudible.)  All right.
21              And the second question I have is, the second
22    search warrant reaches out to electronic storage
23    devices?
24              THE WITNESS:  Correct.
25              THE COURT:  Have you since examined their
```

```
 1   contents?
 2            THE WITNESS:  I have seen some of their
 3   contents, not all.
 4            THE COURT:  Well, is there anything about
 5   their contents that you wish to bring to my attention
 6   at this point?  Are there any indications of records,
 7   for example, of buying and selling?
 8            THE WITNESS:  From one of the cell phones
 9   which was seized, we found communications, or text
10   messages which appear to be related to trafficking
11   illegal drugs --
12            THE COURT:  Tell me --
13            THE WITNESS:  -- quantities, quantities of
14   drugs for denominations of currency.
15            THE COURT:  Thank you.
16            Mr. Jeffress?
17                           *    *    *
```

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/_____          December 7, 2011

STEPHEN C. BOWLES